DOWD, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| eSynaptic Response Ltd., Plaintiff(s), | ) | CASE NO. 5:07 CV 2050 |
| v. | ) | MEMORANDUM OPINION |
| The Bradley Co., LLC, et al., Defendant(s). | ) | (Resolving Doc. No. 14) |

Before the Court is the motion for partial judgment on the pleadings (Doc. No. 14) filed by defendants The Bradley Company Ltd., L.L.C ("Bradley Co."), Robert Bradley ("Bradley"), and Dry Land Training, L.L.C. ("Dry Land") (collectively, "defendants"). Plaintiff filed a response (Doc. No. 21) and the defendants filed a reply (Doc. No. 30). Defendants seek judgment on the pleadings on their counterclaim against the plaintiff.[1] For the reasons set forth below, defendants' motion for judgment on their counterclaim is granted. Defendants also seek judgment on the pleadings with respect to the claims in plaintiff's complaint. That portion of defendants' motion is denied.

[1] In its Amended Complaint (hereafter, "complaint"), plaintiff alleged, based on information and belief, that Dry Land is a d/b/a of Bradley Co. (Compl. ¶ 2). As a result, plaintiff's allegations against Bradley Co. stemmed only from its mistaken belief that Dry Land's actions are inherently attributable to Bradley Co. (*See*, *e.g.*, Compl. ¶¶ 19-21). Plaintiff has since stated that it is without information sufficient to form a belief as to whether the two companies are related. (Answer to Countercl. ¶ 3). Bradley Co. and Dry Land are actually separate legal entities. (Countercl. ¶ 3). In order to mirror the allegations of the complaint, the counterclaims were brought in the names of Bradley and Dry Land only. Had it been properly named in the complaint, Bradley Co. would be entitled to assert the same counterclaims and defenses.

## I. UNDISPUTED FACTUAL BACKGROUND

Bradley is an individual who resides in Alaska. He owns and/or operates various Alaskan businesses, including Bradley Co. and Dry Land. (Countercl. ¶ 1; Answer to Countercl. ¶ 1). Dry Land operates an ice rink and training facility. (Countercl. ¶ 3). Plaintiff engages in the business of licensing software, including club membership management software known as FirmPOS. (Countercl. ¶ 4; Answer to Countercl. ¶ 4).

Bradley and Dry Land obtained the FirmPOS software from an individual named Kiril Kononov and an entity named Alaska Tech Support in exchange for debt owed to Bradley by Kononov. (Compl. ¶ 20; Answer ¶ 20). Kononov installed the FirmPOS software on a computer located at Bradley Co. on February 18, 2007. (Compl. ¶ 14; Countercl. ¶ 10).

On April 17, 2007, Bradley contacted plaintiff by telephone to request technical support for the FirmPOS software. (Compl. ¶ 18; Countercl. ¶ 16; Answer to Countercl. ¶ 16). He spoke with plaintiff's owner, Mark Brown ("Brown"). (Countercl. ¶ 16; Answer to Countercl. ¶ 16). During the conversation, Bradley explained to Brown that Bradley had purchased the FirmPOS software from Kononov, who then installed the software at Dry Land. (Compl. ¶ 19; Countercl. ¶ 17; Answer to Countercl. ¶ 17). Brown informed Bradley that he would investigate, from plaintiff's end, the possible source of the operational difficulties. (Countercl. ¶ 18; Answer to Countercl. ¶ 18).

Approximately thirty minutes later, Brown telephoned Bradley and suggested the possibility that the software Kononov had installed on the Dry Land computer was unlicensed. (Countercl. ¶ 19; Answer to Countercl. ¶ 19). Brown asked Bradley for permission to remote

access the Dry Land computer, which Bradley allowed. (Countercl. ¶ 20; Answer to Countercl. ¶ 20). Brown then told Bradley that the FirmPOS software on the Dry Land computer was an unlicensed version. (Countercl. ¶ 21). Although the defendants have denied it (Answer ¶ 19), plaintiff's complaint alleges that Bradley admitted he and the company were using unlicensed software. (Compl. ¶ 19).

Having discovered the alleged source of the operating difficulties, Brown informed Bradley that he would have to purchase a licensed version of FirmPOS and related software; Brown offered to sell plaintiff a license to use the FirmPOS software at Dry Land and Bradley accepted the offer. (Countercl. ¶ 22; Answer to Countercl. ¶ 22). On or about April 18, 2007, Bradley, on behalf of Dry Land, entered into a Purchase Agreement with plaintiff for a licensed version of FirmPOS and related software. (Countercl. ¶ 25; Answer to Countercl. ¶ 25). Bradley paid plaintiff $3,294.00 by credit card for the software. (Countercl. ¶ 26; Answer to Countercl. ¶ 26). In addition, on May 11, 2007, Bradley returned to the plaintiff the unlicensed version of the software installation disk and user guide, as well as a "burned" copy of the FirmPOS software installed on the Dry Land computer. (Countercl. ¶¶ 28-29; Answer to Countercl. ¶¶ 28-29).

On May 18, 2007, in a telephone call with Maureen Machado, a representative of Dry Land, Brown confirmed his receipt of the returned unlicensed software. (Countercl. ¶¶ 30-31; Answer to Countercl. ¶¶ 30-31). Machado reminded Brown that Dry Land had yet to receive the licensed software it had purchased a month earlier. She also told Brown that Dry Land was greatly inconvenienced by this because it had to process all its clients manually as it was preparing for the upcoming hockey season. (Countercl. ¶¶ 32-34; Answer to Countercl. ¶¶ 32-

34). That same day, Bradley attempted to call plaintiff's representative, Jason Burgess, and left him a message reiterating the information given to Brown. (Countercl. ¶ 36; Answer to Countercl. ¶ 36). On May 18, 2007, Burgess sent Bradley an e-mail indicating that plaintiff would not deliver a licensed version of the software to Dry Land. (Countercl. ¶ 37; Answer to Countercl. ¶ 37). Plaintiff issued a "refund" for the purchase price of the FirmPOS and related software. (Countercl. ¶ 38; Answer to Countercl. ¶ 38).

This lawsuit followed on July 10, 2007.

## II. DISCUSSION

### A. Standard for Judgment on the Pleadings

Fed. R. Civ. P. 12(c) provides that "[a]fter the pleadings are closed -- but early enough not to delay trial -- a party may move for judgment on the pleadings." [2] In a recent Sixth Circuit decision, the court explained:

> . . . For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *Southern Ohio Bank v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 479 F.2d 478, 480 (6th Cir. 1973). But we "need not accept as true legal conclusions or unwarranted factual inferences." *Mixon v. Ohio*, 193 F.3d 389, 400 (6th Cir. 1999). A Rule 12(c) motion "is granted when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." *Paskvan v. City of Cleveland Civil Serv. Comm'n*, 946 F.2d 1233, 1235 (6th Cir. 1991).

*JPMorgan Chase Bank, N.A. v. Winget*, -- F.3d --, 2007 WL 4355181, at *3 (6th Cir. Dec. 14, 2007).

---

[2] Federal Rules of Civil Procedure, effective December 1, 2007.

**B. Analysis re: Defendants' Counterclaim**

In order for defendants to receive judgment on the pleadings on their breach of contract counterclaim, the pleadings must demonstrate: (1) the existence of a contract; (2) defendants' performance under the contract; (3) plaintiff's breach; and (4) damage to defendants. *Sashti, Inc. v. Glunt Industries, Inc.*, 140 F.Supp.2d 813, 816 (N.D. Ohio 2001) (citing *Doner v. Snapp*, 98 Ohio App.3d 597, 600 (Ohio App. 2 1994)).

**1. The Existence of a Contract**

A valid contract requires an offer and acceptance, supported by valid consideration. *Noroski v. Fallet*, 2 Ohio St.3d 77, 79 (1982). Plaintiff has admitted the existence of these elements as follows:

Offer

| | |
|---|---|
| Counterclaim ¶ 22: | "eSynaptic offered to sell Bradley a license to use the FirmPOS software at Dry Land." |
| eSynaptic's Response: | "The Plaintiff admits the allegations contained in paragraph 22 of the Counterclaim." |

Acceptance

| | |
|---|---|
| Counterclaim ¶ 22: | "Bradley accepted eSynaptic's offer." |
| eSynaptic's Response: | "The Plaintiff admits the allegations contained in paragraph 22 of the Counterclaim." |

Consideration

| | |
|---|---|
| Counterclaim ¶ 26: | "To acquire the software, Bradley paid eSynaptic $3,294.00 by Visa credit card on April 18, 2007." |

eSynaptic's Response: "The Plaintiff admits the allegations contained in paragraph 26 of the Counterclaim. . . ." [3]

Valid Contract

Counterclaim ¶ 25: "On or about April 18, 2007, Bradley, on behalf of Dry Land, entered into a Purchase Agreement with eSynaptic for licensed versions of the FirmPOS software and the emetric gateway software for Dry Land."

eSynaptic's Response: "The Plaintiff admits the allegations contained in paragraph 25 of the Counterclaim."

It is clear that plaintiff has admitted all of the essential elements of a contract and has even admitted that there was a valid contract.

In its response to defendants' motion, plaintiff argues that the End User Licensing Agreement ("EULA") associated with the FirmPOS software gave the plaintiff the unfettered right to terminate the license it granted to defendants. Plaintiff points to several sections of the EULA which provide for termination if an end user were to "attempt to 'hack', 'crack' or otherwise override the provisions" of the license or were to "decompile, disassemble, reverse engineer or modify the Software[.]" Plaintiff argues that, since defendants were using unlicensed software obtained from Kononov, they were in breach of the EULA, therefore entitling plaintiff to terminate the license granted on April 18, 2007. This is an entirely circular

[3] In ¶ 26 of its Answer to the Counterclaim, although admitting the factual allegations of Counterclaim ¶ 26, plaintiff added the following: "however, the Plaintiff further states that upon the Plaintiff's further investigation, and upon learning that the Counterclaimants knew or should have known that they were dealing with unlicenced [sic] software, from the beginning of their use of the software, all sums charged to the VISA credit card were refunded to the Counterclaimants." This additional language, more in the nature a defense to the counterclaim, is insufficient to negate the admission.

argument. Defendants' use of unlicensed software occurred prior to the April 18, 2007 license granted by the plaintiff, which contains the EULA provisions. Plaintiff cannot use the terms of the April 18, 2007 license to justify termination of the license for conduct that occurred prior to the license. Furthermore, at the time plaintiff entered into the Purchase Agreement and granted the license on April 18, 2007, it already knew that the defendants were using unlicensed software. In fact, it was plaintiff's discovery that defendants were using an unlicensed version of FirmPOS that prompted plaintiff's offer to sell defendants the licensed version.

**2. Defendants' Performance Under the Contract**

Bradley accepted plaintiff's offer and paid $3,294.00 for the licensed software. This fulfilled defendants' obligations under the Purchase Agreement.

**3. Plaintiff's Breach**

One month after entering into a valid Purchase Agreement with defendants for the purchase of a licensed version of the FirmPOS software and after accepting payment from the defendants, plaintiff refused to deliver the software. This was obviously a material breach of the Purchase Agreement. Since a valid contract had already been formed and since defendants had already performed their part of the contract, plaintiff's unilateral attempt to repudiate the contract by "refunding" defendants' payment was entirely ineffective and did not cure or excuse the breach.

**4. Damage to the Defendants**

Plaintiff's breach caused damage to the defendants. Because the licensed software was not provided by the plaintiff, Dry Land had to process all its clients manually and, furthermore,

needed the software immediately because the hockey season was fast approaching. Dry Land's Maureen Machado clearly explained this to eSynaptic's Brown, who understood defendants' predicament. Plaintiff has not even attempted to refute these facts. Clearly, defendants have established that they suffered damages; the only remaining question is the amount.[4]

**C. Analysis re: Plaintiff's Claims**

Defendants also seek judgment on the pleadings with respect to plaintiff's claims in the complaint. The Court is of the view that the standard for judgment on the pleadings has not been met with respect to plaintiff's claims.[5]

## III. CONCLUSION

For the reasons discussed above, defendants' motion for judgment in their favor on the counterclaim pleadings is GRANTED. Defendants' motion for judgment on the pleadings with respect to plaintiff's complaint is DENIED.

IT IS SO ORDERED.

December 26, 2007
Date

*s/ David D. Dowd, Jr.*
David D. Dowd, Jr.
U.S. District Judge

---

[4] The amount of defendants' damages is a question for the factfinder.

[5] By denying judgment on the pleadings with respect to plaintiff's claims, the Court is not ruling out the possibility that defendants may be able to prevail on a motion for summary judgment following the completion of discovery.